**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANDREW J. KONDAS,

    Plaintiff,

         v.

JACK E. POTTER, Postmaster General,
United States Postal Service,

    Defendant.

CIVIL ACTION No. 3:05-CV-1861

(JUDGE CAPUTO)

## <u>MEMORANDUM</u>

Presently before the Court is the Motion for Summary Judgment of Defendant Jack E. Potter, Postmaster General, United States Postal Service (Doc. 47).  Because in responding to Defendant's motion, Plaintiff chooses to "only pursue his claims that he was denied training at NCED on numerous occasions in retaliation for his participation in legally protected activity"; because no question of material fact exists as to whether Defendant Jack E. Potter, Postmaster General of the United States Postal Service, acted with retaliatory intent in regard to Plaintiff Andrew J. Kondas, the Defendant's Motion for Summary Judgment will be granted.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 ("federal question jurisdiction").

## BACKGROUND

Plaintiff Andrew J. Kondas is employed as an electronic technician ("ET") by the United States Postal Service ("USPS"), at its Scranton Processing and Distribution Center ("Scranton P&DC").  (Def.'s Statement of Material Facts, [hereinafter "Def.'s SOF"], Doc. 49 ¶ 1; Pl.'s Response to Def.'s Statement of Material Facts [hereinafter

"Pl.'s Response"] Ex. 8 to Doc. 58 ¶ 1.)  The Defendant in this case is Jack E. Potter,

Postmaster General for the USPS.

### A.    Initial Events at NCED Training Facility

For his job, Plaintiff took training courses from time to time at the USPS' National

Center for Employment Development ("NCED") in Norman, Oklahoma. (Def.'s SOF ¶ 2;

Pl.'s Response ¶2.)  Plaintiff has testified about conflicts with two (2) instructors of these

courses.   First, Plaintiff testified that in July of 1989, his supervisors allowed him to miss

a day of training because of a planned vacation and this decision angered instructor

Orville Turner, also identified as Butch Turner.  (Kondas Dep., Nov. 7, 2007, Ex. A to

Doc. 58, at 22:20 - 26:22.)  Plaintiff testified that Turner phoned Plaintiff's mother, also a

USPS employee, and told her he would ensure that Plaintiff was fired, causing her to

become very upset; Plaintiff later phoned Turner to confront him about this behavior.  (*Id.*)

Second, Plaintiff testified that in 1997, another instructor, Bob Lee, "pushed me, and I

said just keep your hands off me." (*Id*. at 116:1-2.)

In 1998, Kondas attended an "AFCS" class at the NCED in Oklahoma on the use

of a certain USPS machine.  (Def.'s SOF ¶ 2; Pl.'s Response ¶ 2.)  Per the advice of his

psychiatrist, Kondas sought to avoid instructors Turner and Lee; he asked Earline

Charlton, the head of student services, which instructor would be teaching the course and

requested to have instructors other than Turner or Lee.  (Def.'s SOF ¶¶ 3-5; Pl.'s

Response ¶¶ 3-5.)  Plaintiff avers that although he recounted his history with these

instructors to Ms. Charlton, she told him that he was the problem, that Mr. Turner and Mr.

Lee were the only instructors, and that Plaintiff had no right to ask for different instructors.

(Kondas Dep., Ex. A to Doc. 58, at 42:5-16, 44:8-15.)  Plaintiff told Ms. Charlton that he was did not want to be instructed by Bob Lee "because he pushed me.  I said I'm not responsible if he touches me again. You put me in a class with him again and he gets cocky, I'm not responsible for what happens."  (*Id.* at 44:20-23; Def.'s SOF ¶¶ 5-6; Pl.'s Response ¶¶ 5-6; Pl.'s Counterstatement of Undisputed Facts, Ex. 8 to Doc. 58 ¶ 5-8.) Ms. Charlton told Plaintiff that he was making threats.  (Def.'s SOF ¶ 7; Pl.'s Response ¶ 7.)  According to Ms. Charlton, this conversation took place on November 13, 1998, and Mr. Kondas

> kept talking about kicking anyone's ass who interfered with his mother, I believe referring to his local managers. . . . He made a statement in reference to Bob Lee that he knew about chemicals and could do lots of things.  When I explained to him that his comment was a veiled threat he mentioned something about chemicals for IJP (Ink Jet Printer).

(EEO Investigative Affidavit, July 21, 1999, Doc. 49-3.)

On a subsequent training trip to Oklahoma, on December 18, 1998, Kondas entered Ms. Charlton's office after completing a course and gave her his certificate of completion, on the back of which he had written: "I will return, and payback is guaranteed, Ed Nahl, Tell Butch Turner."  (Def.'s SOF ¶¶ 8-9; Pl.'s Response ¶¶ 8-9.) Plaintiff admits he wrote this, but states that he told Ms. Charlton that by the term "payback is guaranteed," he meant he would file grievances.  (Def.'s SOF ¶ 9; Pl.'s Response ¶9.)  Kondas further testified:

> I went down and handed it to her and grievances are coming.  Every time I come out here I will file a grievance against you people. . . . I didn't mean any harm to any people. . . . Grievances is what I'm going to file every time. They took that so seriously that in 1999, August, while this process was going on, they signed an agreement . . . that no grievances can be processed out in Oklahoma. . . . I was out there and filed a safety complaint Ed Nahl . . . and it wasn't frivolous, . . . And Ed Nahl, they take grievances

3

> and they take safety complaints very personally.  Good, because I've taken
> what they've done personally.

(Kondas Dep, Ex. A to Doc. 58, at 120:21 - 122:13.)  Ms. Charlton stated, however, that

Kondas only "slapped down" the certificate on her desk, "said something to the effect I

could keep this and give it to Ed Nahl [a Technical Training Specialist at the NCED] and

Butch Turner," and "[t]here was no other conversation."  (EEO Investigative Aff., Doc. 49-

3.)  According to Ms. Charlton, "[a]s a result of Mr. Kondas' actions NCED Management

and the threatened staff felt Mr. Kondas' actions were increasingly severe in nature and

constituted actual threats directed against specific individuals."  (*Id.*)  Defendants also

submitted a response to an email, prepared by Jim Dikes, Support Service Specialist for

NCED, in which Dikes reported about a December 28, 1998 "predisciplinary meeting" that

Dikes himself did not attend.  (*See* Dikes Response, Def.'s Ex. N, at 3, Doc. 58, at 7.)

Dikes quotes Plant Manager Gerry McNamara describing Kondas' explanation of what

his note meant:

> Basically his definition to that is that when he comes back to Oklahoma and
> if he happens to be in Butch Turner's class, he is going to do everything he
> can basically to be a pain as far as maybe coming into class late, taking
> annual leave, and actually to the point where I asked him if he would
> actually sabotage a machine to be a pain, he told me he would.  I repeated
> my question again and he said the same thing and added that whatever it
> would take to get somebody off his back.

(Dikes Response, Def.'s Ex. N, at 1, Doc. 58, at 5.)

## B.    Initial Decision to Ban Kondas from Training at NCED

It is undisputed that in late December 1998, the Threat Assessment Committee

determined that Kondas posed a threat to employees and training equipment, and

recommended to NCED supervisor Steven Mosier that Kondas be banned from training

at NCED courses.  (Def.'s SOF ¶¶ 11-12; Pl.'s Response ¶¶ 11-12.)  Upon receiving this

recommendation, Mr. Mosier decided to institute such a ban.  (Def.'s SOF ¶ 13; Pl.'s

Response ¶ 13; Dep. of Steven Bruce Mosier, Feb. 15, 2008, Def.'s Ex. H to Doc. 54, at

24:9-12.)  The ban did not affect Plaintiff's ability to receive training at other locations.

(*See* Response of Jim Dikes, Support Service Specialist for NCED, to Aug. 20, 2002

email of Courtney Wheeler, USPS Attorney, Def.'s Ex. N, at 1, Doc. 58, at 5; USPS v.

Am. Postal Workers Union [APWU], Case No. C00T-1C-C05032397, Aug. 1, 2007

(Zobrak, Arb.) Def.'s Ex. NN, Doc. 54-3.)  Defendant submits that this ban was intended

to be permanent, but Plaintiff argues that it was not.  (Def.'s SOF ¶ 11; Pl.'s Counter-SOF

¶¶ 11, 13-14.)  Both parties agree that Mr. Mosier stated that he intended the ban to last

as long as the threat existed.  (Def.'s SOF ¶ 14; Pl.'s Response ¶ 14.)  Subsequently,

Plaintiff was terminated by the USPS, grieved his termination, and was reinstated with full

back pay and benefits by a June 30, 2000 arbitration award.  (Def.'s Ex. M, Doc. 54; *see*

USPS v. APWU, Aug. 1, 2007 (Zobrak, Arb.) Def.'s Ex. NN, Doc. 54-3) (discussing the

earlier arbitration award in which Plaintiff was reinstated)).

## C.   Post-Reinstatement Events

Since his reinstatement, Plaintiff has not been allowed to attend training at the

NCED; he has only been allowed to attend "satellite" courses in other locations.  (*Id.*)  As

a result, he filed a grievance that led to a second arbitration in 2007; this grievance was

denied, as the arbitrator concluded that (1) the collective bargaining agreement governing

Plaintiff's employment contained no contractual right to attend specific training, (2) that

the first arbitrator's award reinstating Kondas to his employment with a "make whole"

5

remedy "d[id] not confer to him the additional right of attending training in Norman, Oklahoma," and (3) at least based on the information then before the arbitrator, Plaintiff had not suffered "demonstrated harm" based on his exclusion.  (*See id.*)

Plaintiff does not dispute that, even after his reinstatement, some people at the NCED expressed concern for their safety and the safety of their families in the event that he be allowed to return to the NCED; Plaintiff does dispute, however, that the concerns were reasonable, citing, among other things, the initial arbitration decision that reinstated him.  (Def.'s SOF ¶ 24; Pl.'s Response ¶ 24.)  Although the parties did not produce this arbitration decision, both parties refer to an email written by USPS attorney Courtney Wheeler that summarizes the decision.  (Def.'s SOF ¶ 25; Pl.'s Response ¶ 25; Email from Courtney Wheeler to Carl Sumner, Aug. 20, 2002, Def.'s Ex. L, Doc. 54.)  In the email, Mr. Wheeler states in part that "[t]he arbitrator clearly addressed the issue of whether or not Kondas was a threat to postal employees and found that the Postal Service's beliefs were misplaced.  While some might disagree with this conclusion, the facts set out in the award reasonably support his decision."  (Wheeler email, Def.'s Ex. L, Doc. 54.)  The second arbitrator characterized the initial award's findings regarding Kondas' behavior as follows: "Although it was determined that the Grievant acted as alleged, Arbitrator Milller concluded that the Postal Service failed to prove the charges against him [violation of the USPS "Zero Tolerance Policy" and "Improper Conduct"] and, therefore, did not have just cause to discharge him."  (*USPS v. Am. Postal Workers Union,* Aug. 1, 2007 (Zobrak, Arb.) Def.'s Ex. NN, Doc. 54-3.)

In response, Defendant cites behavior of Mr. Kondas after his reinstatement.  In particular, after an April 2004 training that Kondas attended locally, he completed a

course evaluation and wrote on the comments section: "Fuck You Steve Mosier and your buddies?  Tell Dumb Bastard I said Hello!!  Look Forward to Seeing You all!!!"  (NCED Training Satisfaction Survey, Def.'s Ex. GG, Doc. 54-3, at 34-35; Def.'s SOF ¶ 63; Pl.'s Response ¶ 63.)) Steve Mosier is manager of the NCED, and "Dumb Bastard" was a nickname Kondas had adopted for himself in a previous training course.  (Def.'s SOF ¶ 62; Pl.'s Response ¶ 62.)  After finding out about this comment, Douglas Baxter, Manager of Maintenance and the USPS Scranton facility, who had earlier attempted to get Kondas into more training, came to conclude that Kondas should not return to NCED because "my thought then was, you know, this guy is carrying a grudge too long.  So who knows what might happen if he was out in training at NCED?"  (Douglas D. Baxter Dep., Doc. 54-3, Def.'s Ex. 54-3, at 68:22 - 69:16; Def.' SOF ¶¶ 64-65; Pl.'s Response ¶ 64-65.)  Although this comment led Baxter to "be reserved about sending him to training at NCED," Baxter never knew Kondas to be violent or noticed anything that he would consider to indicate that Kondas was a danger to anybody.  (Baxter Dep., Doc. 54-3, at 68:24-25, 69:23 - 70:9.)

On April 27, 2004, the Threat Assessment Team met again and concluded that "Mr. Kondas should NOT be allowed to return to NCED for training" because he "continues to demonstrate Priority 1 risk factors, as outlined in publication 108, the Threat Assessment Team guide."  (NCED Threat Assessment Team Report - April 27, 2004, Re: Andrew Kondas, Def.'s Ex. HH, Doc. 54-3.)  Specifically, "he has [illegible] an act of violence, identified targets both verbally and in writing, and seems to have an obsessive focus on grudge." (*Id.*)  The Team also noted that "[w]hile it is assumed that Mr. Kondas can be monitored during regular training hours, there is no guarantee Mr. Kondas will not

act upon his verbal and written threats during non-training hours." (*Id.*)

Plaintiff filed his initial Complaint in this case on September 14, 2005 and filed amended complaints on February 20, 2006; October 10, 2006; and January 9, 2007. (See Docs. 1, 10, 20, 26.)  In his Third Amended Complaint, Plaintiff brings claims of retaliation for protected Equal Employment Opportunity ("EEO") activity (Count I), and discrimination based on his disability or the Defendant's perception of his disability (Count II), both in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794. (Third Am. Compl., Doc. 26 ¶¶ 60-63.)  Defendant moves for summary judgment on both of Plaintiff's claims, on the grounds (1) that Plaintiff's claims based on certain allegedly retaliatory and discriminatory actions are barred by the statute of limitations, *res judicata*, and/or failure to exhaust; (2) that Plaintiff cannot make out a prima facie case of either retaliation or disability discrimination; and (3) that even if Plaintiff did make out a prima facie case, Defendant had legitimate, non-discriminatory reasons for denying Plaintiff training at the National Center for Employment Development ("NCED"), giving him a pre-disciplinary interview, denying him overtime, and denying him a temporary tour assignment.  (Def.'s Mot. for Summ. J., Doc. 47.)  Defendant's motion is fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." FED. R. CIV. P. 56©.  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *See id.* at 248.   An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to

judgment as a matter of law.  *See Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in

the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888

(1990).  In deciding a motion for summary judgment, "the judge's function is not himself

to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.


## DISCUSSION

_____Under the Rehabilitation Act,

> [n]o otherwise qualified individual with a disability . . . shall, solely by reason
> of her or his disability, be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under . . . any program or
> activity conducted by any Executive agency or by the United States Postal
> Service.

29 U.S.C. § 794(a).  Furthermore, the Rehabilitation Act's implementing regulations also

prohibit threats, coercion, or discrimination against a person "for the purposes of

interfering with any right or privilege secured by [the Act], or because he has made a

complaint, testified, assisted, or participated in any manner in an investigation,

proceedings, or hearing. . . . "  *Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259,

266 n.5 (3d Cir. 2007) (quoting 34 C.F.R. § 100.7(e)).


**I.      Undisputed Narrowing of Claims at Issue**

Plaintiff states in his opposition brief that "[i]n the interest of streamlining these

proceedings, while not conceding to any of Defendant's arguments, Mr. Kondas will only

pursue his claims that he was denied training at NCED on numerous occasions in retaliation for his participation in legally protected activity.  Mr. Kondas will pursue the claims listed in his Complaint at paragraphs 30 c and m, 34 a-f, 39, 45 a, b, d and f, 52 a, b, d, and e, and 57.  Therefore, Mr. Kondas will address Defendant's arguments B.2, C.2, D.1-4, and G.1."  (Br. in Opp'n, Doc. 58, at 12.)

The paragraphs of the Third Amended Complaint that Plaintiff lists are instances of alleged adverse actions taken against him; most allege retaliation only, and while paragraphs forty-five (45) and fifty-two (52) allege both retaliation and discrimination, (*see* Third Am. Compl., Doc. 26 ¶¶ 47, 52) Plaintiff's opposition brief states clearly that he will only pursue his claims that he was denied training "in retaliation for his participation in legally protected activity."  (Doc. 58, at 12.)  His intention to not pursue claims of disability-based discrimination is further underscored by the fact that he responded only to the sections of Defendant's brief that make arguments regarding retaliation.  As the Third Circuit Court of Appeals has noted, "[a]n issue is waived unless a party raises it in its opening brief."  *Hesling v. Seidenberger*, No. 07-2125, 2008 WL 2601334, at *1 n.2 (3d Cir. July 2, 2008) (holding that plaintiff waived her retaliation claims under the ADA and Rehabilitation Act by failing to properly raise them in her opening brief).  As such, judgment in favor of Defendant will be granted as to Count II of Plaintiff's Third Amended Complaint, which alleges disability-based discrimination in violation of the Rehabilitation Act, and as to all claims of retaliation in Count I based on adverse actions other than those referenced in paragraphs 30© & (m); 34(a)-(f); 45(a),(b),(d) & (f); 52(a),(b),(d) & (e); and 57.

**II.     Timely Exhaustion of Administrative Remedies and Timely Filing of Suit**

"Exhaustion of administrative procedures is a precondition to the maintenance of a federal employment discrimination lawsuit." *Burns v. Potter*, No. 1:04-CV-2793, 2007 WL 406201, at *7 (M.D. Pa. Feb. 2, 2007) (Connor, J.); *see also Robinson v. Dalton*, 107 F.3d 1018, 1021 ("[E]xhaustion requires both consultation with an agency counselor and filing a formal EEOC compliant within the required times."). A party bringing an action under the Rehabilitation Act must exhaust the administrative remedies available under Title VII. *Spence v. Straw*, 54 F.3d 196, 200-03 (3d Cir. 1995).

Failure to exhaust administrative remedies in employment discrimination actions is an affirmative defense and thus "the defendant bears the burden of pleading and proving that the plaintiff has failed to exhaust administrative remedies." *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). To timely exhaust, Plaintiff must have taken the following steps. First, he must have initiated contact with an EEO counselor, to attempt informal resolution, "within 45 days of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). Second, he must also have filed a complaint with the USPS within fifteen (15) days of receiving notice from the EEO counselor of his right to file a complaint. 29 C.F.R. § 1614.106(a) & (b). Finally, he must have filed his complaint in federal court within either (a) ninety (90) days of receipt of final action from the USPS if he did not appeal that decision to the EEOC, or (b) if he did appeal, within ninety (90) days of receipt of the EEOC's final decision on that appeal. 42 U.S.C. § 2000e-16©; 29

C.F.R. § 1614.407.

**A.     Identifying the Relevant Adverse Action**

To determine whether Plaintiff met these requirements, the Court must first

determine which events toll the above deadlines, but the parties do not agree about how

to characterize the relevant adverse action, or actions, in this case.  Plaintiff's remaining

claims are based on various incidents when he was allegedly denied training

opportunities at NCED. (*See* Third Am. Compl., Doc. 26.)  Defendant argues that Plaintiff

cannot claim each of these instances as adverse employment actions; rather, the only

adverse action, Defendant argues, was "a permanent ban, instituted in 1999 and

continued when [Plaintiff] returned to work."  (Def.'s Br. in Supp., Doc. 48, at 9, 12.)

Defendant accordingly argues that Plaintiff's claims were not timely exhausted and are

time-barred.

There is "a bright-line distinction between discrete acts, which are individually

actionable, and acts which are not individually actionable but may be aggregated to make

out a hostile work environment claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127

(3d Cir. 2006) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  The

Third Circuit Court of Appeals took from *Morgan* "the following non-exhaustive list of

discrete acts for which the limitations period runs from the act: termination, failure to

promote, denial of transfer, refusal to hire, wrongful suspension, *denial of training*,

wrongful accusation." *Id.* (emphasis added).  Under *Morgan*, discrete acts, such as

denial of training, cannot be aggregated under a continuing violations theory.  *Id.*

Instead, each discriminatory denial of training is a separate violation.  The relevant

13

question is thus which events constitute discriminatory denials of training.

A discrete "unlawful employment practice" "occur[s]" for purposes of Title VII's filing deadline, 42 U.S.C. § 2000e-5(e)(1), at the time of the discriminatory act, not at the time the effects or consequences of the act are felt by the plaintiff. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (holding that discriminatory denial of tenure, not the resulting termination one year later, was the relevant adverse action); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 554-58 (1977) (holding that although plaintiff's 1968 forced resignation violated Title VII, her employer's refusal to credit her pre-1968 time for seniority purposes after she was rehired as a new employee in 1972 was neither a separate discriminatory act nor a continuing violation; plaintiff could not challenge the neutral seniority policy, although it gave "present effect to a past act of discrimination," when she had not timely challenged the initial discriminatory act). Summarizing this rule, the Supreme Court recently stated that, "[a] new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, — U.S. — 127 S. Ct. 2162, 2169 (2007).

"But of course," the Court continued, "if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed." *Id.* In other words, "[t]he existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related [subsequent] discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar

14

an employee from using the prior acts as background evidence in support of a timely claim." *Moran*, 536 U.S. at 113.

The parties' dispute is essentially whether the later instances in which Plaintiff was denied training opportunities at the NCED are merely "subsequent nondiscriminatory acts that entail adverse effects" necessarily resulting from the initial, permanent ban, or whether they are "fresh violations" that are "independently discriminatory."

This is a factual dispute.  Turning to the record, Plaintiff points to the deposition testimony of Mr. Mosier, who, when asked whether the Threat Assessment Team had recommended Mr. Kondas' ban be permanent, replied "Not that I recall."  (Mosier Dep., Def.'s Ex. H to Doc. 54, at 24:18-19.)  When asked to describe the recommendation he had made, Mr. Mosier replied that it "was not to allow Mr. Kondas to return to the center at that time."  (*Id*. at 25:3-5.)  When asked whether the ban as instituted was intended to be permanent, he replied, "I don't recall that we had any language like that," and when asked whether he himself intended the ban to be permanent, Mr. Mosier replied: "I intended the ban to exist as long as the threat existed."  (*Id.* at 25:6-13.)  He further stated that "[a]nother evaluation by the threat assessment team probably would have been the course of action to determine if the threat still existed" but that while Mosier was at the center, the team had not made any recommendations as to any reevaluation of whether Mr. Kondas could return to the NCED.  (*Id*. at 24:13-17, 25:17-19.)

Plaintiff also points to a statement from instructor Turner, who was a curriculum specialist at NCED and member of the Threat Assessment Team at the time Mr. Kondas was banned.  In his deposition, Turner was asked whether his managers ever told him

15

that they were going to reevaluate whether Mr. Kondas should be allowed back to the

NCED for courses, Turner replied that "I know there are at least two or three occasions

where they have reevaluated and determined that they were going to maintain the ban."

(Dep. of Orville Turner, Dec. 21, 2007, Pl.'s Ex. C, Doc. 58, at 44:7-13.)

Defendant, on the other hand, points to different parts of the record.  For example,

Gene Biglin, Acting Maintenance Manager of the Scranton facility where Kondas worked,

wrote to Plaintiff's union representative, Kevin Gallagher, on March 9, 2001, after Mr.

Kondas had been reinstated to his employment.  In that letter, which a handwritten note

above Mr. Gallagher's initials indicates was received and copied to Mr. Kondas on March

10, 2001, Mr. Biglin told Mr. Gallagher that "[s]ince the incident involving Mr. Kondas

resulted in a *permanent ban* from that facility, they are putting up strong opposition to

lifting the ban.  We are working diligently to get the ban lifted and this will take some time

due to the fact of the amount of people involved . . . ."  (Letter from Gene Biglin to Kevin

Gallagher, Mar. 9, 2001, Def.'s Ex. Q, Doc. 54-2) (emphasis added).  Defendants also

point to a letter Mr. Gallagher wrote to Plaintiff on May 11, 2001, reporting how Mr. Biglin

had responded to Mr. Gallagher's "letter of 4/17/01 questioning as to your status

concerning participating in the normal Electronic Technician training at the USPS

Oklahoma training facility."  (Letter from Kevin Gallagher to A.J. Kondas, May 11, 2001,

Def.'s Ex. T, Doc. 54-2.)  "Gene stated that as of May 4th, you are still locked out of any

training whatsoever at the Oklahoma training facility. . ."  (*Id.*)

Finally, in the June 23, 2005 affidavit of Edward Nahl, Technical Training

Specialist at the NCED, Mr. Nahl stated that "[b]ased on the initial decision of the

December 21, 1998 Threat Assessment Team, and again on April 27, 2004, by a

subsequent meeting of the Threat Assessment Team, the complainant is not allowed to attend training at NCED." (Nahl Aff., Def.'s Ex. F, at 2, Doc. 54-1.)  Mr. Nahl indicated that the initial decision was made by himself, Steve Mosier, and Jim Dikes, and that the "subsequent *affirmation of the original ban*," which "was based solely on the additional threatening activities by the complainant and not related to any EEO activities," was made by Bonne Karim, Veronica Marshall, Orville "Butch" Turner, and Earline Charlton. (*Id.* at 2-3) (emphasis added).

Defendant thus argues that merely because the ban was reevaluated and, upon reevaluation, maintained, does not mean that it was not a permanent ban.  (*See* Def.'s Reply Br., Doc. 61, at 12.)  While this may be true, a reevaluation is itself a decision that had the effect of denying Plaintiff training opportunities at the NCED, and Plaintiff has submitted evidence that his ban has been reevaluated on "at least two or three occasions." (*See* Turner Dep., Pl.'s Ex. C, Doc. 58, at 44:7-13.)

**B.      Exhaustion and Untimeliness**

If the Court temporarily assumes, for purposes of deciding Defendant's Motion, that the actions complained of are indeed discrete actions, as Plaintiff contends, Defendant has not satisfied his burden of proving that Plaintiff's claims are untimely or unexhausted:

(1) Paragraphs 30(c)&(m):  Plaintiff alleges that Defendant retaliated against him by denying him training at the NCED on or about May 28, 2002 and August 7, 2002, and denial of training "for one of five open class slots on or about December 5, 2002." (Third Am. Compl., Doc. 26 ¶ 30(c)&(m)).  These allegations are the subject of EEO case

number 1-C-171-0024-02, which alleged that "[s]ince 1999 adverse actions have been taken against me," and that "[t]he USPS, even after arbitrator Miller's order, has refused me equal training at the NCED."  (EEO Complaint, Pl.'s Ex. 1 to Doc. 10; *see* Partial Acceptance / Partial Dismissal of Formal EEO Complaint, Oct. 29, 2002, Def.'s Ex. Z, Doc. 54 (accepting May and August 2002 incidents for investigation in this case number); Acknowledgment of Amendment, Jan. 6, 2003, Pl.'s Ex. B to Doc. 27) (including December 2002 incident by amendment in this case number)).  The record, however, does not contain any notice of final agency action in this EEO case number, or any indication of when such action occurred.  By not submitting evidence of the date of final agency action, Defendant has not met his burden with regard to these claims.

        (2) Paragraphs 34(a)-(f):  In EEO case number 1C-171-0003-05, Plaintiff challenged the NCED's November 17, 2004 notification to Plaintiff that he was not eligible for the training he had requested and also challenged five (5) instances, of which Plaintiff became aware between February 17 and May 17, 2005, of other employees, some junior to Plaintiff, being allowed to attend "TACS," "FICS," "AFCS-OCR," and "PICS/SICS Network" training at NCED that Plaintiff was denied. (*See* Third Am. Compl., Doc. 26 ¶¶ 34(a)-(f)).  From the date of the first incident, November 17, 2004, Plaintiff would have had until January 1, 2005 – forty-five (45) days later – to contact a dispute resolution counselor.  Although the record does not indicate the date he did so, the record does include the counselor's "Notice of Right to File Individual Complaint" on January 6, 2005, which indicated in that Plaintiff's complaint, EEO case number 1C-171-0003-05, would be deemed timely if he filed his formal complaint within fifteen (15) days.  (*See* Pl.'s Ex. C to Doc. 27.)  Plaintiff did so, filing the formal complaint based on this incident on January

27, 2005.  (EEO Complaint, Pl.'s Ex. C to Doc. 26.)  A "Notice of Final Agency Decision" in this case number was issued November 21, 2005.  (Pl.'s Ex. D to Doc. 27.)  If this incident is a discrete adverse action, exhaustion requirements are met.

(3) Paragraph 39: In EEO case number 1C-171-0009-04, Plaintiff challenged a denial of his December 2, 2003 request to attend "UFSM 1000 system" training at the NCED.  (*See* Third Am. Compl., Doc. 26 ¶ 39; EEO Complaint, Ex. E to Doc. 26.) Plaintiff filed his formal complaint on January 25, 2004, which indicated he had discussed this complaint with a dispute resolution specialist.  (Ex. E to Doc. 26.)  A "Notice of Final Action" was filed on July 12, 2006.  (Ex. 7 to Pl.'s Second Am. Compl., Doc. 20.)  If this incident is a discrete adverse action, exhaustion requirements are met.

(4) Paragraphs 45 (a),(b),(d),(e) & (f): In EEO case number 1C-171-0015-05, Plaintiff challenged the denial of his requests to attend "RCR" training on August 14, 2005 when a junior employee was given that opportunity; denial of his request to attend "AFCS-OCR upgrade" training on August 23, 2005 when another employee was later given that opportunity, and the denial of overtime on October 22, 2005 because he did not have this upgrade training; and denial of the opportunity to attend "AFCS-OCR" training at the NCED from December 8 through 16, 2005 and from January 9 through 18, 2006.  (*See* Third Am. Compl., Doc. 26 ¶¶ 45 (a),(b),(d),(e) & (f)).  Plaintiff filed a formal complaint in this case on October 4, 2005 which was later amended to include the later incidents.  (*See id.*; EEO Investigative Affidavit, Douglas Baxter, Manager, Maintenance, June 14, 2006, Pl.'s Ex. 7, Doc. 58.)  The formal complaint indicates Plaintiff discussed the August 2005 incidents with a dispute resolution specialist, who signed the complaint form on September 20, 2005, fewer than forty-five (45) days after the earliest alleged

adverse action on August 14, 2005.  (*See* EEO Complaint, Pl.'s Ex. G to Doc. 26.)

Plaintiff received a "Notice of Final Agency Decision" in this case on October 5, 2005

(Pl.'s Ex. H to Doc. 26), and filed his initial Complaint in this Court on September 14,

2005.  Thus, if these incidents are discrete adverse actions, exhaustion and timely filing

requirements are met.

(5) Paragraphs 52(a),(b),(d) & (e): In EEO case number 4C-170-0013-06, Plaintiff

challenged the following incidents: being bypassed for "AFCS-OCR" training on February

2, 2006 and for "Network + Training" on February 6, 2006; being determined ineligible to

attend "Merlin" training scheduled for April 24 through May 4, 2006 and "FRES" training

scheduled for May 5 through 11, 2006, at the NCED.  (Third Am. Compl., Doc. 26 ¶¶

52(a),(b),(d) & (e); Pl.'s Ex. J to Doc. 26).  The initial formal EEO complaint in this case is

undated but was signed by the dispute resolution specialist on April 3, 2006 and Plaintiff's

Third Amended Complaint indicates it was filed April 19, 2006.  (*See* EEO Complaint,

Pl.'s Ex. I to Doc. 26.)  This complaint was later amended to include the later incidents

and Plaintiff received a "Notice of Final Agency Decision" from the USPS on October 12,

2006.  (Pl.'s Ex. J to Doc. 26.)  If these incidents are discrete adverse actions, exhaustion

and timely filing requirements are met.

(6)       Paragraph 57: In EEO case number 1C-171-0015-06, Plaintiff challenged

denial of "FRES" training at NCED on June 5, 2006.  (*See* Third Am. Compl., Doc. 26 ¶

57.)  In this case, Plaintiff received the "Notice of Right to File Individual Complaint" from

his dispute resolution counselor on July 11, 2006; filed a formal EEO complaint July 21,

2006 (Pl.'s Ex. K to Doc. 26); and received a Notice of Final Agency Decision on

November 13, 2006.  (Pl.'s Ex. L to Doc. 26.)  If these events are discrete adverse

actions, then exhaustion and timely filing requirements are met.

Given the facts and arguments detailed in Section A, the Court finds it apparent that a question of fact exists as to whether the decisions to deny the Plaintiff training at NCED represented a single, continuous ban or, in contrast, represented several discrete actions by the Defendant.  Moreover, as Section B shows, the determination of this fact is essential to resolving the question of whether the Defendant has met its burden in showing that Plaintiff's claims are untimely or unexhausted.  Accordingly, the Defendant's Motion for Summary Judgment cannot succeed on Defendant's timeliness and exhaustion arguments. (*See* Doc. 47 at ¶¶ 1 - 8)


**III. Plaintiff's Prima Facie Case of Retaliation**

"To establish a prima facie case of retaliation under the [Rehabilitation Act], a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action[.]"   *Ozlek v. Potter*, 259 Fed. App'x 417, 422 (3d Cir. 2007) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

### A.      Plaintiff's Protected EEO Activity

Defendant concedes that Plaintiff engaged in protected activity when he filed EEO discrimination complaints on April 14, 1999 (Pl.'s Ex. M), March 11, 2001 (Pl.'s Ex. N), September 11, 2002, January 25, 2004, January 28, 2005, October 4, 2005, April 19,

2006, and July 21, 2006.   Defendant also concedes that Plaintiff engaged in protected

activity when he filed his February 14, 2000 complaint in this Court.

> ### B.    Adverse Employment Action

The Supreme Court has stated that in order to show an adverse employment

action "a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, 'which in this context means it well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (*quoting Rochon v.*

*Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006)).

In the current case, the Defendant contends that the ban preventing Plaintiff from

training at the NCED facility does not meet this standard because the Plaintiff was able to

pursue training opportunities at other training locations.  (Def.'s Br. in Supp., Doc. 48, at

16.)  The Defendant further supports this argument by citing to the August 1, 2007

decision of a labor arbitrator finding that "[t]here is no indication that [Mr. Kondas] has

been denied any employment opportunities due to this training arrangement." (*Id.*,

quoting Def.'s SOF, Doc. 49 ¶ 100(g).)

In contrast, Plaintiff contends that his lack of training at NCED resulted in

numerous adverse consequences, including being denied a transfer to an office in

Pleasantville, NJ, being denied a promotional position at MTSC, being disqualified from a

Tour I assignment, and a loss of thirty-two (32) hours overtime. (Br. in Opp'n, Doc. 58, at

21.)  Further, Plaintiff contends that both the quantity and quality of training he received

was substandard when compared to the training received by his peers at the NCED

facility. (*Id.*)  In support of these arguments, Plaintiff offers testimony of his supervisors. (Pl.'s Counterstatement of Undisputed Facts, Ex. 8 to Doc. 58 ¶¶ 35-39.)  The Plaintiff also relies on statements made by Courtney Wheeler, a USPS attorney, during an August 2002 review of the Plaintiff's arbitration award and reinstatement.  At that time Wheeler stated of the Plaintiff: "By denying him the opportunity to attend training, we are denying him full employment privileges, effectively limiting his employment opportunities, and in all likelihood, ultimately terminating his employment." (Br. in Opp., Doc. 58, at 22.)

In light of these competing arguments, a question of material fact clearly remains concerning whether the Plaintiff's inability to receive training at the NCED facility satisfies the requirements to be considered an adverse employment action.

### C.    Causal Connection

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  Or, "[i]n the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation.'" *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). The Third Circuit Court of Appeals has further noted that "[a] court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him . . . could be chilled from taking action that he deemed appropriate and . . . a putative plaintiff by engaging in protected activity might be able to insulate himself from

actions adverse to him that a public actor should take." *Id.*

The Defendant here argues that the Plaintiff cannot show a causal relationship between the alleged adverse employment action and the Plaintiff's protected activities before this Court and the EEO.  To dispute the presence of such a relationship, the Defendant highlights how alleged adverse employment actions, including loss of overtime pay, disqualification from promotion, and restrictions on training at NCED, followed incidents of protected EEO or federal court filings by as little as two (2) months and as many as fifteen (15) months. (Def.'s Br. in Supp., Doc. 48, at 19-24.)

Defendant offers this analysis to show that many of the alleged adverse actions distantly followed incidents of protected activity and suggests that these time differentials refute any causal relationship, but Defendant also acknowledges a Third Circuit Court of Appeals' opinion clarifying causation with respect to the timing of alleged retaliatory action.  In *Krouse v. American Sterilizer Co.*, the Court acknowledged that the Circuit's cases "are 'seemingly split' on the question of whether the timing of the allegedly retaliatory action can, by itself, ever support a finding of causation," before establishing that "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." 126 F.3d 494, 503 (3d Cir. 1997) (*citing Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997)).  The *Krouse* Court continued by further noting that "the 'mere passage of time is not legally conclusive proof against retaliation.'  When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Id.* at 503-504 (*quoting  Robinson v. Southeastern Pa.*

24

*Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)).  Accordingly the Plaintiff's satisfaction

of the third required element of a *prima facie* case of retaliation under the Rehabilitation

Act cannot be determined by simply looking at the time elapsed between Plaintiff's

protected activity and Defendant's alleged retaliatory action.

      Rather than focusing exclusively on the gap between Plaintiff's protected activity

and the alleged retaliatory action taken by the Defendant, the Court must make a more

generalized inquiry into whether the Plaintiff's protected activity was the likely cause for

the alleged retaliation. *See Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 179 (3d Cir.

1997).  In addition to the timing analysis discussed above, the Defendant attempts to

refute the inference of any causal relationship between the Plaintiff's protected activity

and the alleged retaliation acts by arguing that there is no evidence of a pattern of

antagonism between the Plaintiff and his supervisors at the USPS.  In support of this

argument, the Defendant points to unsuccessful attempts by the Plaintiff's immediate

supervisors to register the Plaintiff for training at NCED. (Def.'s Br. in Supp., Doc. 48, at

20; Def.'s SOF, Doc. 49 ¶¶ 20-21.)  Defendant also points to statements by Plaintiff's

supervisor stating that the Plaintiff is "[t]op notch, highly qualified.  In my opinion, I have

not seen a better electronic technician in my time at the Postal Service." (Def.'s Br. in

Supp., Doc. 48, at 20; Def.'s SOF, Doc. 49 ¶ 19.)  In contrast, Plaintiff suggests that his

supervisors were not motivated to help the Plaintiff receive training at the NCED and

were frustrated and annoyed with the Plaintiff's frequent complaints to the EEO. (Br. in

Opp., Doc. 58, at 26.)

      In light of the generalized inquiry into the circumstances surrounding Plaintiff's

protected activity and the alleged retaliatory action, and also because of the competing

arguments concerning the actions and motivations of the Plaintiff's supervisors at the USPS, questions of material fact exist regarding the causal relationship between the protected activity and the allegedly adverse actions taken by the Defendant.

### IV. Legitimate non-Discriminatory Reasons

Once a plaintiff establishes a prima facie case of retaliation under the Rehabilitation act, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Ozlek v. Potter*, 259 Fed. App'x 417, 422 (3d Cir. 2007) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).  Steven Bruce Mosier, the supervisor at NCED, testified that he made the decision to ban the Plaintiff from training after receiving a report from the NCED Threat Assessment Committee and learning of threats made by the Plaintiff against NCED staff and their family members. (Mosier Dep., Def.'s Ex. B, Doc. 58-4, at 22:9 -24:12.)  Mosier further testified that, in light of Plaintiff's actions and his responsibility for the safety of the NCED staff, he chose to deny the Plaintiff training under the authority of a USPS zero tolerance policy for violence that includes verbal and written threats.  (*Id.*, at 26:13-19.) In order to satisfy its burden under the Rehabilitation act an employer needs only to "articulate" a legitimate reason for the adverse employment action. *Krouse*, 126 F.3d at 500.  With this testimony, the Defendant has met this burden.

### V. Pretext

"If the employer satisfies its burden, the plaintiff must be able to convince the

factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Ozlek*, 259 Fed App'x at 422 (quoting *Krouse*, 126 F.3d at 500-01).  Generally, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (quoting *Krouse*, 126 F.3d at 504).  The Court of Appeals, in *Ozlek*, held that the plaintiff had failed to carry his burden of demonstrating pretext where "the record is devoid of any evidence that would raise a genuine issue of fact as to whether Stewart's proffered reason was pretextual." *Id.*

The plaintiff must do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)).  However, "if the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reason, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.* (citing *Fuentes*, 32 F.3d at 764).

Here, Plaintiff attempts to rebut Defendant's articulated reasons for denying him training at NCED by pointing to the finding of an arbitrator in Plaintiff's April 2000 arbitration hearing that "the record did not establish that [Plaintiff] made any specific threats of violence toward anyone, and to consider his actions as being dangerous would be tantamount to speculation." **(**Br. in Opp., Doc. 58, at 27.**)**  Plaintiff also cites to the

statement of a USPS attorney that there was "no legal basis for contending that the nearly five year old conduct is grounds to bar him from needed training.  This is especially so since [Plaintiff] has committed no acts since his return that remotely suggest he is a threat to anyone." (*Id.* at 28.)  Finally, the Plaintiff further attempts to rebut the Defendant's reason for the NCED ban by offering evidence that the Plaintiff did not receive any discipline following incidents where he threatened NCED staff and that the Plaintiff's supervisors never knew him to be violent in any way. (*Id.* At 28-29.)

While this evidence addresses whether the Defendant's characterization of Plaintiff as a safety risk was either correct or mistaken, it does not rebut the non-discriminatory reasons articulated by the USPS as motivation for banning Plaintiff from NCED.  The Plaintiff admits to several incidents where he directed conceivably threatening language at NCED staff and supervisors.  Plaintiff, however, disputes the seriousness of these threats and suggests that the danger they presented was "a matter of speculation." (*See* Pl.'s Counterstatement of Undisputed Facts, Ex. 8 to Doc. 58 ¶ 23.) The Defendant, however, has articulated that, in light of previous incidents, the USPS has adopted, and in this case acted upon, a zero tolerance policy in regard to written or verbal threats of violence. (Mosier Dep., Def.'s Ex. B, Doc. 58-4, at 26: 13-19.) Accordingly, determinations concerning the credibility or dangerousness of the Plaintiff's "vile threats" (*See* Pl.'s Resp. To Def.'s Statement of Material Facts**,** Ex. 8 to Doc. 58 ¶ 7) are unnecessary.  The Plaintiff seeks to show that surrounding circumstances mitigate the potential danger in comments like "I don't care.  I'll piss in [USPS printers] if I have to," "I will return and payback is guaranteed," and "Fuck you Steve Mosier and your

buddies? Tell Dumb Bastard I said Hello!  Look forward to seeing you all!!!**"** (*See* Pl.'s

Counterstatement of Undisputed Facts, Ex. 8 to Doc. 58 ¶¶ 7, 10, 52-53.)  The USPS,

however, by adopting a zero tolerance policy, empowered its employees to act, not just

on those threats that could be shown to be reasonable or credible, but on *any* threat of

violence.

Since the Plaintiff does not dispute that he made these comments, does not

dispute the presence of a USPS zero tolerance policy against violence and words of a

threatening nature, and since he has offered no other evidence suggesting that retaliation

was the motivation for denying him training at NCED, he has failed to rebut the

Defendant's articulated non-retaliatory motivation for banning him from the NCED facility.

### CONCLUSION

**A**.      Because Plaintiff elected not to pursue his claims of disability-based

discrimination, summary judgment will be entered in favor of the Defendant

as to Count II of Plaintiff's Third Amended Complaint, which alleges

disability-based discrimination in violation of the Rehabilitation Act, and as

to all claims of retaliation in Count I based on adverse actions other than

those referenced in paragraphs 30(c) & (m); 34(a)-(f); 45(a),(b),(d) & (f);

52(a),(b),(d) & (e); and 57.

**B**.      Because no question of material fact exists as to whether Defendant Jack

E. Potter, Postmaster General of the United States Postal Service acted

with retaliatory intent in regard to Plaintiff Andrew J. Kondas, the

Defendant's Motion for Summary Judgment (Doc. 47) will be granted as to

Plaintiff's Count I retaliation claims referenced in paragraphs 30(c) & (m);

34(a)-(f); 45(a),(b),(d) & (f); 52(a),(b),(d) & (e); and 57 of Plaintiff's Third

Amended Complaint.


An appropriate order follows.



 September 4, 2008                                        /s/ A. Richard Caputo
Date                                                     A. Richard Caputo
                                                         United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANDREW J. KONDAS,

    Plaintiff,

      v.

JACK E. POTTER, Postmaster General,
    United States Postal Service,

    Defendant.

CIVIL ACTION No. 3:05-CV-1861

(JUDGE CAPUTO)

## ORDER

      Now, this 4th day of September, 2008, it is **HEREBY ORDERED** that Defendant's

Motion for Summary Judgment (Doc. 47) is **GRANTED.**  The Clerk of the

Court is directed to mark this case **CLOSED**.

                              /s/ A. Richard Caputo
                              A. Richard Caputo
                              United States District Judge